## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JULIAN ROYAL,

      Plaintiff,

      v.                            Civ. No. 13-748 WJ/KK

NOR-LEA HOSPITAL DISTRICT *et al.*,

      Defendants.

### MAGISTRATE JUDGE'S PROPOSED FINDINGS
### AND RECOMMENDED DISPOSITION

THIS MATTER is before the Court on the following motions:

(1)    Defendants Nor-Lea Hospital District's and Sherry Whitehead, R.N.'s (collectively, "Defendants") Motion for Summary Judgment (Doc. 33), filed February 26, 2015;

(2)    Plaintiff's ("Mr. Royal") Motion for Summary Judgment (Doc. 50), filed June 11, 2015;

(3)    Mr. Royal's Amended Civil Rights Complaint (Doc. 44), filed May 13, 2015;

(4)    Defendants' Motion to Strike Plaintiff's Amended Complaint and/or Motion to Amend Complaint (Doc. 45), filed May 18, 2015; and,

(5)    Mr. Royal's Motion to Vacate Civil Rights Complaint Against Nurse Hart (Doc. 55), filed July 6, 2015.

By an Order of Reference filed on May 21, 2015, these matters were referred to the undersigned to conduct hearings as warranted, and to perform any legal analysis required to recommend an ultimate disposition of the case.  (Doc. 46.)  Having reviewed and considered the parties' submissions, the record, and the relevant law, and being otherwise fully advised, the undersigned recommends as follows:

(1)     That Defendants' Motion for Summary Judgment (Doc. 33) be GRANTED IN PART as to Mr. Royal's federal constitutional claims, and that the Court decline to exercise supplemental jurisdiction over Mr. Royal's state law claims, which should be DISMISSED WITHOUT PREJUDICE;

(2)     That Mr. Royal's Motion for Summary Judgment (Doc. 50) be DENIED;

(3)     That Mr. Royal's motion for leave to file a second amended complaint, in the form of his Amended Civil Rights Complaint (Doc. 44), be DENIED;

(4)     That Defendants' Motion to Strike Plaintiff's Amended Complaint and/or Motion to Amend Complaint (Doc. 45) be DENIED AS MOOT; and,

(5)     That Mr. Royal's Motion to Vacate Civil Rights Complaint Against Nurse Hart (Doc. 55) be DENIED AS MOOT.

## I. Background and Procedural History

This case arises out of Defendants' provision of medical care to Mr. Royal while he was detained or incarcerated at the Lea County Detention Center ("LCDC") for periods of time from August 18, 2010 to March 3, 2012.[1]  In his Amended Complaint (Doc. 13), Mr. Royal asserts that, while he resided at LCDC, Defendants provided him with constitutionally inadequate and substandard medical care resulting in permanent injury to his eye and partial loss of eyesight. (*Id.* at 3, 5.)  More particularly, Mr. Royal alleges that Defendant Sherry Whitehead, R.N. ("RN Whitehead") relied on her own judgment regarding the seriousness of his medical needs, contributed to a dysfunctional medical care program at LCDC, and failed to respond

---

[1]   Mr. Royal was housed at LCDC from May 21, 2010 to November 21, 2011, from January 17, 2012 to March 5, 2012, and from October 26, 2012 to November 8, 2012.  (Doc. 41 at 3.)  Mr. Royal was housed in the LCDC Medical Unit from December 19, 2010 to December 28, 2010, and from September 23, 2011 to November 21, 2011. (*Id.*)  Plaintiff is currently incarcerated at the Central New Mexico Correctional Facility ("CNMCF") in Los Lunas, New Mexico.

appropriately to his complaints of chronic and debilitating eye pain.  (*Id.* at 5.) Mr. Royal alleges that RN Whitehead's acts and failures to act constitute deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the United States Constitution, and were also negligent.  (*Id.*)  Mr. Royal further alleges that Defendant Nor-Lea Hospital District ("Nor-Lea"):  (1) denied him medical care as a result of a custom, policy, or practice of refusing and/or delaying treatment to save money; (2) withheld care until he paid or agreed to pay for that care; and, (3) "failed to provide care at a level of health services reasonably designed to meet required routine and emergency medical, dental, and psychological or psychiatric care[.]"  (*Id.* at 2-4.) Mr. Royal alleges that these acts and failures to act violated his rights under the Eighth and Fourteenth Amendments.  (*Id.* at 3-4.)  Liberally construing his Amended Complaint, Mr. Royal also appears to assert a state law medical malpractice claim against Nor-Lea for "failing to provide [him] reasonably adequate medical care[.]" (*Id.* at 3.)

Mr. Royal filed this lawsuit on August 13, 2013.  (Doc. 1.)  The Court reviewed his original complaint *sua sponte*, and ordered Mr. Royal to amend it because its title was inconsistent with the relief sought,[2] and because it failed to state a claim on which relief could be granted.  (Doc. 11.)  Thus, on January 9, 2014, Mr. Royal filed an Amended Complaint.  (Doc. 13.)  Upon reviewing Mr. Royal's Amended Complaint *sua sponte*, the Court determined that only his allegations against Nor-Lea and RN Whitehead "may state claims for violations of Plaintiff's constitutional protections," and dismissed his claims against former Defendants Cervantes, Gartman, Downey, Tabor, and Lea County Commissioners.  (Doc. 22 at 1-2.)  On December 4, 2014, Defendants answered Mr. Royal's Amended Complaint.  (Doc. 29.)  Mr.

---

[2] Mr. Royal called his original complaint a "Motion for Writ of Habeas Corpus for Civil Rights Violation."  (Doc. 1.)

Royal filed a Memorandum and Reply to Defendant's Answer to Plaintiff's Civil Rights Complaint on June 10, 2015.  (Doc. 49.)

On January 14, 2015, the Court entered an Order for *Martinez* Report, which required Defendants "to investigate the incident or incidents underlying Plaintiff's lawsuit and submit a report of their investigation in order to develop a factual or legal basis for determining whether Plaintiff has a meritorious claim."  (Doc. 31 at 2.)  Defendants filed a Motion for Summary Judgment on February 26, 2015, and a *Martinez* Report on April 13, 2015, in which they incorporated their Motion for Summary Judgment by reference.  (Docs. 33, 41.)  Mr. Royal filed an untimely Response to Defendants' Motion for Summary Judgment on July 6, 2015 (Doc. 56),[3] and an untimely Response to Defendants' *Martinez* Report on July 16, 2015 (Doc. 63).[4] He also filed a cross Motion for Summary Judgment on June 22, 2015.  (Doc. 50.)  Defendants responded in opposition to this motion on June 25, 2015, (Doc. 54), and Mr. Royal filed a reply in support of it on July 9, 2015.  (Doc. 60.)

---

[3] After Mr. Royal failed to timely respond to Defendants' summary judgment motion, Defendants filed a Reply in Support of Motion for Summary Judgment and a Notice of Briefing Complete on April 2, 2015.  (Docs. 36, 38.) However, on April 13, 2015, the Court struck Defendants' Reply, and granted Mr. Royal until June 17, 2015 to respond to Defendants' motion and *Martinez* Report.  (Doc. 40.)  When Mr. Royal failed to comply with this new deadline, Defendants filed a Renewed Reply in Support of Motion for Summary Judgment on June 24, 2015. (Doc. 53.)  Mr. Royal ultimately responded to Defendants' motion on July 6, 2015, (Doc. 56), and also filed a "Reply to Defendants' Renewed Reply in Support of Motion for Summary Judgment" on July 8, 2015.  (Doc. 59.)

[4] Mr. Royal's responses to Defendants' summary judgment motion and *Martinez* Report are unsworn.  (Docs. 56, 63.)  Additionally, in these responses, Mr. Royal incorporates by reference his Memorandum and Reply to Defendant's Answer to Plaintiff's Civil Rights Complaint (Doc. 49), also unsworn, to which he attached a witness statement "regarding the standard of medical care and procedure," and an electronic mail message containing "side effect information on Trazadone and Venlafaxine."  (Docs. 49-2, 49-6.)  These attachments are unsworn and otherwise fail to comply with 28 U.S.C. § 1746, and are also immaterial to Mr. Royal's constitutional claims.  While the Court must construe a *pro se* litigant's pleadings liberally, "they must still comply with the minimum requirements of the [summary judgment] rules.  In the absence of other evidence, an unsworn allegation does not meet the evidentiary requirements of" Federal Rule of Civil Procedure 56.  *Gorton v. Williams*, 309 F. App'x 274, 275 (10th Cir. 2009) (citations omitted); *see United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005) (unpublished decisions are not binding precedent in the Tenth Circuit, but may be cited for their persuasive value). As such, none of these documents set out facts on which the Court may rely at the summary judgment stage.  *See* Fed. R. Civ. P. 56(c); *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991).

In addition to the foregoing, on May 13, 2015, Mr. Royal filed a document entitled "Amended Civil Rights Complaint," which the Court construes as a motion for leave to file a second amended complaint. (Doc. 44); *see* Fed. R. Civ. P. 15(a) (setting forth requirements for the amendment of pleadings before trial). Defendants filed a Motion to Strike Plaintiff's Amended Complaint and/or Motion to Amend Complaint on May 18, 2015. (Doc. 45.) Mr. Royal responded to Defendants' motion to strike on June 8, 2015, and Defendants filed a reply in support of the motion on June 19, 2015. (Docs. 48, 51.) Mr. Royal also filed a "Response" to Defendants' reply, *i.e.*, a surreply, on July 6, 2015. (Doc. 57.) Finally, on July 6, 2015, Mr. Royal filed a Motion to Vacate Civil Rights Complaint Against Nurse Hart, to which Defendants did not respond. (Doc. 55.)

## II. <u>Analysis</u>

### A.   <u>The Parties' Cross Motions for Summary Judgment</u>

Summary judgment is appropriate where the pleadings, discovery materials, and affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit, and the dispute is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). At the summary judgment stage the Court must resolve all reasonable inferences and doubts in favor of, and construe all evidence in the light most favorable to, the non-moving party. *Hunt v. Cromartie*, 526 U.S. 541, 552-53 (1999). In ruling on a summary judgment motion, the Court may neither make credibility

determinations nor weigh the evidence to determine the truth of a disputed matter. *Anderson*, 477 U.S. at 249; *Gossett v. Oklahoma*, 245 F.3d 1172, 1175 (10th Cir. 2001).

The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (citing *Celotex Corp.*, 477 U.S. at 325). Once the movant meets this burden, Rule 56(c) requires the non-moving party to designate specific facts showing that there is sufficient evidence to support a verdict in his favor. *Anderson*, 477 U.S. at 256-57; *Celotex Corp.*, 477 U.S. at 324; *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record[.]" Fed. R. Civ. P. 56(c)(1)(A). A mere "scintilla of evidence" supporting the nonmoving party's position will not defeat an otherwise properly supported motion for summary judgment. *Anderson*, 477 U.S. at 252. Indeed, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

For purposes of summary judgment, a prisoner's complaint is treated as an affidavit if it alleges facts based on his personal knowledge and has been sworn under penalty of perjury. *Hall*, 935 F.2d at 1111. A *Martinez* report is also treated as an affidavit for summary judgment purposes if the report's statements are based on personal knowledge and sworn under penalty of perjury. *Id.* A court cannot resolve material disputed factual issues by accepting a *Martinez* report's findings when they are in conflict with sworn pleadings or affidavits. *Id.* at 1109.

6

However, conclusory allegations without specific supporting facts have no probative value and cannot create a genuine issue of fact.  *See Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1143 (10th Cir. 2005), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516 (2002); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004); *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992).  As is true with all affidavits, statements of mere belief must be disregarded.[5] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006).  While it is not "the proper function of the district court to assume the role of advocate for the *pro se* litigant,"  because Mr. Royal appears in this case *pro se*, the Court construes his pleadings and submissions liberally, holding them to a less stringent standard than is required of a party represented by counsel.  *See Hall*, 935 F.2d at 1110.

### 1.   Proposed Findings of Fact

Viewing the record evidence in the light most favorable to Mr. Royal and drawing all reasonable inferences in his favor, the Court proposes the following findings of undisputed material fact[6]:

1.   Mr. Royal was detained or incarcerated at LCDC from May 21, 2010 to November 21, 2011, from January 17 to March 5, 2012, and from October 26 to November 8, 2012.  (Doc. 41 at 3.)  Mr. Royal resided in the LCDC Medical Unit from December 19 to December 28, 2010, and from September 23 to November 21, 2011.  (*Id.*)

---

[5] In his response to Defendants' summary judgment motion, Mr. Royal does not specifically controvert the undisputed material facts in Defendants' motion, merely denying them in a general and conclusory manner and relying on his unsworn Memorandum and Reply to Defendant's Answer to Plaintiff's Civil Rights Complaint. (Doc. 56 at 1, 2.)  Similarly, in his response to Defendants' *Martinez* Report, Mr. Royal summarily states that he "refutes Defendant[s'] statement of undisputed material facts" but does not specifically controvert them.  (Doc. 63 at 3.)

[6] Defendants attached the entire medical chart generated during Mr. Royal's time at LCDC to their *Martinez* Report. (Doc. 41 at 1.)  Defendants also attached the sworn Second Affidavit of Ubaldo Cervantes, R.N., who attested to the records' accuracy and authenticity.  (Doc. 41-1 ¶ 5.)

2.      Mr. Royal first reported right eye pain on November 23, 2010.  (Doc. 41-2 at 2-3.)
He told FNP Tabor that his eye had started to hurt two days earlier.  (*Id.*)  FNP Tabor noted that
Mr. Royal's eye was red and watery.  (*Id.*)  She performed a Wood's lamp exam, which was
negative for any clinical problems.  (*Id.*)  She also examined Mr. Royal's eyelid, which was
negative for abnormality or foreign body.  (*Id.*)  FNP Tabor diagnosed Mr. Royal with right eye
conjunctivitis, prescribed a seven-day course of Tobradex ophthalmic drops, and advised
Mr. Royal to return in ten days, which he did.  (*Id.*)  FNP Tabor's exam notes from December 3,
2010, indicate that Mr. Royal had no eye complaints and that his conjunctivae were pink.  (*Id.* at
7.)

3.      Mr. Royal resided in the LCDC medical unit from December 11 to December 28,
2010, due to multiple medical complaints.  (Doc. 41-2 at 19, 35-36.)  On December 28, 2010,
FNP Tabor ordered laboratory studies for anemia and polyarthralgia.[7]  (Doc. 41-3 at 98.)

4.      Mr. Royal next reported eye pain on February 22, 2011, at 4:30 p.m., submitting a
medical request form stating "my eye hurts."  (Doc. 41-4 at 2.)  In reply the next morning, RN
Whitehead requested that Mr. Royal be specific with his complaint so that a plan of action could
be determined.  (*Id.*)  Mr. Royal waited until February 27, 2011 to respond by submitting another
medical request form indicating that there was "something wrong wit[h] my eye."  (*Id.* at 3.)
Follow-up notes by A. Cantu, L.P.N. dated March 2, 2011, indicate that Mr. Royal "refused to be
seen per Officer Kirk."  (*Id.* at 3.)

5.      On March 26, 2011, at 4:21 p.m., Mr. Royal submitted a medical request form
stating "my eye hurts and I don't know what's wrong wit[h] it."  (Doc. 41-4 at 10.)  J. Gomez,
R.N., performed a "pink eye" protocol exam the following morning, and noted itching, swelling,

---

[7] These studies included a chemistry panel, blood count, immunology, antinuclear antibody profile, antistreptolysin
O, rheumatology factor, C3 and C4 complements, protein electrophoresis, immunofixation serum, cytoplasmic
antibodies, HLA-B27, and cyclic citrullinated peptide antibody.  (Doc. 41-3 at 23-34.)

redness, drainage, and pain in Mr. Royal's right eye, with no symptoms of blurred vision or light sensitivity.  (*Id.* at 11.)  RN Gomez scheduled a doctor visit for March 29, 2011, and instructed Mr. Royal to submit a new medical request form if his symptoms worsened.  (*Id.*)  FNP Tabor saw Mr. Royal on March 29, 2011, and indicated that Mr. Royal's right eye was red with a small amount of swelling, and that Mr. Royal reported that it had been itching and watering for four days.  (*Id.* at 13.)  FNP Tabor noted "rt. eye – slt. injected laterally – watering[,] no exudate[;] lt. eye . . . neg."  (*Id.*)  She diagnosed Mr. Royal with allergic conjunctivitis, prescribed a ten-day course of Maxitrol ophthalmic drops, and instructed Mr. Royal to return to clinic if his symptoms worsened.  (*Id.*)

6.     About a month later, on April 22, 2011, Mr. Royal submitted another medical request form stating "there's something wrong wit[h] my eye[.]"  (Doc. 41-4 at 14.)  R. Gaitan, R.N., performed a "pink eye" protocol exam the next morning, and noted blurred vision, redness, and tearing for four or five days.  (*Id.* at 15.)  RN Gaitan also noted cold and allergy symptoms, including nasal congestion, sore throat, allergic rhinitis, and enlarged tonsils.  (*Id.*)  RN Gaitan provided Mr. Royal with Tussin, Benadryl, and Ibuprofen, scheduled a doctor visit on April 26, 2011, and instructed him to submit a new medical request form if his symptoms worsened.  (*Id.*)  FNP Tabor saw Mr. Royal on April 26, 2011, and indicated that Mr. Royal complained of right eye pain, itching, redness, and watering since approximately April 16, 2011.  (*Id.* at 18.)   An exam revealed "sclera reddish [and] vascular more [at] inferior aspect[;] Ø exudate[;] Ø watering[;] lt. eye – neg."  (*Id.*)  FNP Tabor assessed "probable allergies," prescribed a ten-day course of Prednisolone ophthalmic drops, and instructed Mr. Royal to return to clinic if his symptoms worsened.  (*Id.*)

7.     On May 22, 2011, Mr. Royal submitted a medical request form complaining of, *inter alia*, eye pain.  (Doc. 41-4 at 19.)  RN Whitehead performed a "pink eye" protocol exam on May 24, 2011, and noted blurred vision, redness, and tearing in Mr. Royal's right eye for one week.  (*Id.* at 20.)  RN Whitehead also noted that Mr. Royal complained that "[his eye] never cleared up [and] it's been blurry for months.  I can't see [any]thing."  (*Id.*)  RN Whitehead scheduled a medical provider visit for May 27, 2011, and instructed Mr. Royal to submit a new medical request form if his symptoms worsened.  (*Id.*)  FNP Tabor saw Mr. Royal on May 27, 2011.  (*Id.* at 21.)  She documented Mr. Royal's history of right eye symptoms and treatment beginning in November 21, 2010.  (*Id.*)  FNP Tabor noted "rt. eye ↑ red[;] slt. watering[;] lt. eye neg."  (*Id.*)  An eye exam was negative for foreign body, abrasion, and erythema, and within normal limits under the eyelid.  (*Id.*)  FNP Tabor assessed right eye scleritis and scheduled Mr. Royal to be seen by Optometrist Clay Reber.[8]  (*Id.*)

8.     Mr. Royal submitted a medical request form on June 5, 2011, complaining "there is still something wrong wit[h] my eye.  Can I please get some help[.]  I can't see."  (Doc. 41-4 at 24.)  The following morning, U. Cervantes, R.N., informed Mr. Royal that an optometrist would see him as soon as his appointment came up.  (*Id.*)  Dr. Reber examined Mr. Royal on June 7, 2011.  (*Id.* at 25-26.)  Dr. Reber noted that Mr. Royal reported "a new loss of vision.  Affecting both center and side vision.  Vision is reduced at all times.  Extent of loss is severe.  Vision loss has been rapid.  First noticed four months ago."  (*Id.*)  Dr. Reber evaluated both eyes, assessed visual acuity, performed tonometry tests and slit-lamp exams, and examined Mr. Royal's pupils and lenses.  (*Id.*)  Dr. Reber's impression was

Right Eye:     Posterior synechiae
NOTES:         Unable to view the posterior pole, due to a very small pupil

---

[8] At the relevant times, Dr. Reber practiced optometry at the Family Vision Center in Lovington, New Mexico, and was not a Nor-Lea employee.

NOTES:      I suspect uveitis glaucoma and damage to the optic nerve
NOTES:      IOP is normal today, but he shows evidence of uveitis episode
              w/lens pigment dusting and synechiae 360 degrees.

(*Id.*)  Dr. Reber administered cycloplegic agents in the office and prescribed Atropine Sulfate eye drops to "[t]ry to break synechiae free."  (*Id.*)  Dr. Reber instructed Mr. Royal to report any unusual symptoms or changes in his condition, and indicated he should be scheduled for a progress evaluation on or about June 16, 2011.  (*Id.*)

9.      On June 10, 2011, Mr. Royal presented to the LCDC medical clinic with complaints of right eye irritation and reported, "I can[] hardly see out of it."  (Doc. 41-4 at 30.) FNP Tabor examined Mr. Royal's right eye and observed that his pupil was enlarged and irregular compared to his left pupil, but there was no erythema.  (*Id.*)  FNP Tabor noted that Mr. Royal was under Dr. Reber's care for his vision problems and had a follow-up appointment with him on June 16, 2011.  (*Id.*)

10.      Mr. Royal saw Dr. Reber on June 17, 2011, and complained of blurred vision, but no pain or discomfort.  (Doc. 41-4 at 36.)  Dr. Reber performed a tonometry test and examined the anterior chamber of Mr. Royal's right eye.  (*Id.*)  Dr. Reber noted that "[a] complete posterior synechiae is present.  Synechiae has not broken free, after atropine treatment."  (*Id.*)  Dr. Reber assessed Mr. Royal with "right eye: posterior synechiae," and suspected "prior uveitic crisis to cause the synechiae" that "resulted in uveitic glaucoma and optic nerve damage OD resulting 20/200 VA."  (*Id.*)  Dr. Reber continued Mr. Royal on Atropine Sulfate eye drops, added Phenylephrine HCL eye drops, and indicated that Mr. Royal should be scheduled for an ophthalmology consultation.  (*Id.*)

11.      Mr. Royal submitted four medical request forms from July 2, 2011 to July 5, 2011, complaining that his eye was hurting and requesting pain medication.  (Doc. 41-4 at 39-

42.)  RN Cervantes told Mr. Royal that he had been referred to a glaucoma specialist and that his medications would be continued as ordered.  (*Id.* at 41.)  LCDC's Medication Administration Record indicates that Mr. Royal's medication at this time included Atropine Sulfate and Phenylephrine HCL eye drops administered twice a day per Dr. Reber's orders.  (Doc. 41-13 at 2.)  RN Cervantes also told Mr. Royal that "any future meds will require for you to move to medical.  Advise and we'll get you moved and started on meds."  (Doc. 41-4 at 42.)  Mr. Royal indicated that he did not want to move to the medical unit.  (*Id.* at 43, 47.)

12.     On July 13, 2011, RN Whitehead contacted Dr. Reber to ask about refilling Mr. Royal's eye medication, describing his pupil's size and reactivity to light, whereupon Dr. Reber discontinued the medication.  (Doc. 41-4 at 52.)

13.     On July 25, 2011, Mr. Royal submitted a medical request form stating, "I need to see the doctor about my left eye and my right eye is hurting."  (*Id.* at 56.)  RN Cervantes informed Mr. Royal that an appointment with a specialist had already been scheduled.  (*Id.*)

14.     Ophthalmologist Barbara Marsh of Eye Associates of New Mexico evaluated Mr. Royal's eyes on August 11, 2011, and prepared a Glaucoma Chart Note.  (Doc. 41-5 at 5-8.)  Dr. Marsh reported Mr. Royal's complaints as follows:

Chief Complaint #1:   Patient presents with cloudy vision in his right eye

HPI #1:      Patient presents with cloudy vision in his right eye for 6 months. Patient saw Dr. Reber about 2 months ago and was told there was some inflammation and the lens is stuck.  Patient does get eye pain sometimes that causes headaches that last for about 2 to 3 days. Patient does not take medication for headaches.  Pat[ient] noticed decline in vision about 6 months ago.

Chief Complaint #2:

HPI #2:      Patient denied history of glaucoma and pt is taking NO medications at this time.  Patient was given phenylephrine TID and

> Atropine TID until gone 1 [sic] in June in Lovington [sic] for
> presumed uveitis.  [L]ast used 1 month ago.

(*Id.*)  Dr. Marsh tested Mr. Royal's visual acuity, intraocular pressure, and corneal pachymetry, and performed an external/slip lamp exam and a posterior segment exam.  (*Id.*)  Dr. Marsh's impressions were as follows:

Impression 1:   Iridocyclitis, unspecified 364.3 Right eye significant cell in AC and vitreous, diffuse posterior synechiae, clinically ?vitritis [sic] – B-scan shows +PVD, no significant vitreous cell, retina attached.

Plan 1:   The patient was counseled in detail on the diagnosis and understands.  Recommend start pred qid and Atropine bid OD. Will order Uveitis work up.

RTC:   Return in 1 Month for Follow-up exam, with Dr. Barbara Marsh, MD

Impression 2:   Visual loss, unspecified 369.9  Right eye probably due to problem #1.  ON OU clinically healthy.

Plan 2:   Counseled patient on examination findings and all diagnosis.  No treatment is indicated at this time.  Will continue to observe.

Impression 3:   Adhesions of iris, unspecified 364.70   Right eye due to #1. Chronic.

Plan 3:   Recommend continue cycloplegia for now.  Continue observation.

(*Id.*)  To identify possible sources of inflammation, Dr. Marsh ordered lab work and a chest x-ray, which were completed on August 24, 2011.[9]  (*Id.* at 18-20, 32, 33-39.)  The lab work included a blood count, toxoplasma antibody IgM, anti-neutrophil cytoplasmic serum, angiotensin-converting enzyme, fluorescent treponemal antibody absorption, and lysozyme. (Doc. 41-5 at 33-39.)

---

[9] On August 18, 2011, RN Cervantes sent a facsimile to Dr. Marsh stating that some of the laboratory tests she ordered had been done in December 2010.  (Doc. 41-5 at 18.)  RN Cervantes asked Dr. Marsh if these tests should be repeated, or if the prior results could be sent to her along with the results of newly ordered tests.  (*Id.*)

15.     Dr. Marsh saw Mr. Royal on September 23, 2011, for a follow-up exam for iridocyclitis of the right eye.  (Doc. 41-5 at 51-53.)  Dr. Marsh examined both eyes, tested Mr. Royal's visual acuity and intraocular pressure, and performed an external/slit lamp exam. (Id.)  Dr. Marsh's impressions were as follows:

Impression 1:  Iridocyclitis, unspecified 364.3  Right eye still w/inflammation, lab work up negative, HLA B27 results missing.[10]

Plan 1:        The patient was counseled in detail on the diagnosis and understands.  Increase pred to 6x/day and continue Atropine bid OD.  Recommend retina eval to assess for possible posterior inflammation?  Recommend rheumatology consult to be arranged by correctional facility.

RTC:           Return in 1 Month for Retinal consult, with Dr. Mark Chiu, MD

Impression 2:  Visual loss, unspecified 369.9 Right eye Va improved, cannot rule out cause of inflammation

Plan 2:        Recommend retina eval as in plan #1.

Impression 3:  Nuclear sclerosis and posterior subcapsular senile cataract 366.19 Right eye probably contributing to VA, could improve with sx.

Plan 3:        Could consider CEIOL when cleared from retina.

(Id.)

16.     Mr. Royal resided in the LCDC Medical Unit from September 23, 2011 to November 21, 2011, during which time medical staff including RN Whitehead administered his prescribed eye drops and monitored his eye for redness, swelling, and pain.  (See Docs. 41-7 to 41-11.)  On October 17, 2011, Mr. Royal complained that his left eye was hurting.  (Doc. 41-8 at 9-11, 14-16, 18-19.)  On October 19, 2011, FNP Tabor ordered pain medication for Mr. Royal,

---

[10] On September 27, 2011, the LCDC medical unit faxed the HLA-B27 test results from December 28, 2010 to Dr. Marsh.  (Doc. 41-6 at 19; see Proposed Fact ("PF") No. 3 and Note 7, supra.)

and indicated that he needed to have lab tests and to be scheduled with Dr. Reber to rule out herpes.  (*Id.* at 20.)  Lab work was completed that day.  (Doc. 41-8 at 23.)

17.     On October 28, 2011, Mr. Royal presented to Dr. Reber and reported left eye pain for a few weeks and left eye redness for approximately one week.  (Doc. 41-9 at 2-3.)  Mr. Royal also reported blurred vision and a watery discharge.  (*Id.*)  Dr. Reber examined both eyes, performed visual acuity and tonometry tests, and evaluated Mr. Royal's left eye for uveitis/iritis.  (*Id.*)  Dr. Reber assessed Mr. Royal with left eye acute iritis and prescribed a thirteen-day course of Prednisolone acetate eye drops and a seven-day course of Homatropine eye drops.  (*Id.* at 4.)  Dr. Reber instructed Mr. Royal to report any unusual symptoms or changes in his condition, and to return to the clinic in 72 hours.  (*Id.* at 3.)

18.     Mr. Royal returned to Dr. Reber on November 3, 2011.  (Doc. 41-9 at 36-37.)  Dr. Reber examined both eyes, and determined that Mr. Royal's left eye condition was responding to medication.  (*Id.*)  Dr. Reber instructed Mr. Royal to continue using the eye drops previously prescribed, and indicated Mr. Royal should be scheduled for a blood work up to determine the cause of his frequent cases of iritis.  (*Id.*)  Dr. Reber further instructed Mr. Royal to report any unusual symptoms or changes in his condition, and to return to clinic on or about November 7, 2011.  (*Id.*)

19.     On November 8, 2011, FNP Tabor evaluated Mr. Royal for complaints unrelated to his eyes, and noted that an eye appointment was scheduled for Mr. Royal in December in Albuquerque.  (Doc. 41-9 at 60.)

20.     On November 9, 2011, Mr. Royal had a follow-up appointment with Dr. Reber for acute iritis in his left eye.  (Doc. 41-10 at 2.)  RN Gomez noted that all paperwork, lab values, and notes from Mr. Royal's current eye specialists were sent with Mr. Royal for his appointment.

(Doc. 41-9 at 65.)  Mr. Royal told Dr. Reber that his left eye "feels better."  (Doc. 41-10 at 2.)
Dr. Reber noted that Mr. Royal's left eye condition had improved, and that he should continue
with the prescribed eye drops, tapering them as instructed.  (*Id.*)  Dr. Reber advised Mr. Royal to
return in one week.  (*Id.*)

      21.    Mr. Royal returned to see Dr. Reber on November 17, 2011.  (Doc. 41-10 at 36-
37.)  Mr. Royal reported right eye pain for the past four days.  (*Id.*)  Dr. Reber examined Mr.
Royal's eyes and determined that the iritis in his right eye was worsening.  (*Id.*)  Dr. Reber also
noted that Mr. Royal's left eye continued to respond to treatment.  (*Id.*)  Dr. Reber increased the
frequency of eye drops to Mr. Royal's right eye, decreased the frequency of eye drops to his left
eye, and advised that he should be referred to an ophthalmologist.  (*Id.*)

      22.    On November 21, 2011, Mr. Royal was transferred from LCDC to CNMCF.
(Doc. 41 at 3; Doc. 41-11 at 18, 30.)  On November 22, 2011, RN Gomez faxed Mr. Royal's
Medication Administration Record to CNMCF, which included information regarding Mr.
Royal's eye condition and his scheduled appointment with Ophthalmologist Mark Chiu in
Albuquerque on December 16, 2011.  (Doc. 41-11 at 19.)

      23.    Ophthalmologist Michael DiMonaco of Eye Associates of New Mexico evaluated
Mr. Royal on November 22, 2011.[11]  (Doc. 41-11 at 21-24.)  Dr. DiMonaco reported Mr.
Royal's complaints as follows:

    Chief Complaint #1:   The patient reports decreased vision in both eyes.

    HPI #1:      The patient reports decreased vision in both eyes.  The patient
               states that his vision has become more "blurred" over the last
               week.  He states his right eye was having pain over the last two
               weeks and the pain went away "2 days ago."

---

[11] Mr. Royal was housed at CNMCF on this date.

(*Id.* at 21.)   Dr. DiMonaco reviewed Mr. Royal's ocular history, tested his visual acuity, intraocular pressure, and corneal pachymetry, and performed an external/slip lamp exam and a posterior segment exam.  (*Id.*)  Dr. DiMonaco's impressions were as follows:

1. Impression -     Visual loss, unspecified 369.9 Right eye – OCT shows no edema

    Plan -      Recommend OCT of Macula OD today.

2. Impression -     Iridocyclitis, unspecified 364.3 Right eye – (per Dr. Marsh) lab work up negative, HLA B27 missing.

    Plan -      Recommend starting Durezol QID OD, continuing Prednisolone QD OS only (DC OD) and cont Atropine TID OD only.

3. Impression -     Nuclear sclerosis and posterior subcapsular senile cataract 366.19 – moderate – vision affected/impaired

    Plan -      Counseled patient regarding presence of cataract. Recommend referral to cataract surgeon for evaluation and possible treatment.

                 RTC - Return in 1-2 weeks for cataract consult, Mark Lesher, M.D.

(*Id.*)

24.   On January 17, 2012, Mr. Royal returned to LCDC and immediately submitted a medical request form stating, "my eye is hurting really bad[ly.]  I have been for a week need[ing] something for pain."  (Doc. 41-11 at 29.)  RN Whitehead performed a medical intake screening and noted that Mr. Royal had seen an eye specialist while at CNMCF and needed refills on his prescribed medications, and that his right eye was very red.  (*Id.* at 30.)  FNP Tabor approved refills of Atropine, Prednisolone, and Durezol for Mr. Royal, and requested the Eye Associates records generated while he was at CNMCF.  (*Id.* at 31.)

25.     On January 24, 2012, RN Cervantes rescheduled Mr. Royal's appointment with Dr. Lesher for March 14, 2012.  (*Id.* at 37.)

26.     On March 5, 2012, Mr. Royal was transferred from LCDC to Guadalupe County Correctional Facility.  (Doc. 41-3; Doc. 41-11 at 48.)   In advance of this transfer, RN Cantu completed a health history and medication form on March 4, 2012, noting that "[a]n initial consultation will need to be set up with Dr. Lesher with Eye Associates."  (Doc. 41-11 at 42.)

27.     On October 26, 2012, Mr. Royal returned to LCDC. (Doc. 41-3; Doc. 41-11 at 43.)  The Medical Intake Screening indicates that Mr. Royal had eye surgery "1 month ago R eye cataracts."  (Doc. 41-11 at 43.)  FNP Tabor's Physician Order dated October 29, 2012, approved Mr. Royal's prescribed eye medications of Durezol, Ketorolac Trometh, and Prednisolone.  (*Id.* at 48.)

28.     On November 8, 2012, Mr. Royal was transferred from LCDC.  (Doc. 41-3.)

29.     LCDC inmate rules and regulations[12] provide in pertinent part that

**Medical Care** - No one will ever be refused care because of inability to pay for the service.  However, if you receive money on your account at a later date, owed medical fees will be collected before any other purchase (such as commissary) may be made. . . .

**Medical Co-Payments** – Inmates will be charged for specific medical services, the costs are:

| | |
|---|---|
| Physician Services/Dental Services | $10.00 per visit |
| Nursing Services/Pharmacy/Labs/X-Rays | $5.00 per visit/Medication or refill/Test/X-ray |
| Transport to private physician or out of town | $30.00 per officer, 2-officer Minimum |

The pharmacy fee will be charged for each medication ordered or refilled.  In the case of long-term medications . . . a $5.00 charge will be assessed each month for each medication.

---

[12] Defendants attached to their *Martinez* Report a copy of the LCDC statement of inmate rules and regulations, which R.N. Ubaldo attested that he retrieved and provided.  (Doc. 41-1 at 2 ¶ 6.)

> **Medical – Sick Call** – When a valid medical complaint is made, all inmates are entitled to medical attention.   Inmates desiring medical attention for non-emergency complaints must complete a medical request form.   Emergency complaints will be referred to medical staff immediately.  . . .
>
> **Medical-Triage Procedure** – Inmates requesting medical attention are first screened and evaluated by a member of the medical staff, who will determine whether the patient is to be referred to the physician or a specialty clinic.  Not all medical complaints will be referred to a physician.

(Doc. 41-15 at 15-16; Doc. 49-5 at 9-10.)

30.     At the relevant times, medical care and treatment Nor-Lea provided at LCDC had to comply with the requirements, and be provided within the established confines, of LCDC's procedures, rules, and regulations.  (Doc. 34 at 17, Ex. B ¶ 13.)  Nor-Lea was not responsible for the policies regarding how inmates were charged for medical services.  (*Id.*, Ex. B ¶ 6.)

31.     At the relevant times, Nor-Lea provided LCDC inmates with medical care regardless of their ability to pay for those services and did not deny or delay medical care based on an inmate's inability to pay. (*Id.*, Ex. B ¶¶ 7, 8, 9.)

32.     RN Whitehead and Nor-Lea did not delay, deny, or withhold Mr. Royal's medical treatment based on his inability to pay for those services, nor did they condition Mr. Royal's treatment on his ability to pay.  (*Id.*, Ex. B ¶¶ 10, 11.)

33.     RN Whitehead provided nursing care in the medical unit at LCDC that included inmate intakes, medication transport, responding to sick call submissions, and triage duty on days when a physician or nurse practitioner was present at the detention center to see inmates. (*Id.,* Ex. A at 1.)

34.     RN Whitehead provided nursing care to Mr. Royal that included responding to sick call submissions, making nursing assessments, following physician orders, referring Mr.

Royal to the physician to be seen on "doctor days," and ensuring Mr. Royal received his medication.  (*Id.*, Ex. A at 2.)

35.    RN Whitehead, as a nurse, did not make treatment recommendations for Mr. Royal's eye condition.  (*Id.*, Ex. A at 3.)

36.    RN Whitehead reviewed provider notes and orders related to Mr. Royal on October 21-22, 2010, October 26, 2010, November 23, 2010, December 3, 2010, December 14, 2010, December 21, 2010, December 28, 2010, January 14, 2011, February 2, 2011, March 16, 2011, March 29, 2011, May 27, 2011, June 10, 2011, July 13, 2011, August 19, 2011, September 23, 2011, September 30, 2011, October 19, 2011, October 28, 2011, November 3, 2011, November 8, 2011, November 9, 2011, November 17, 2011, and January 17, 2012.  (Doc. 41-1 at 16-17, 19-20; Doc. 41-2 at 3, 7, 9, 32; Doc. 41-3 at 20, 37, 42; Doc. 41-4 at 13, 21, 23, 30, 53; Doc. 41-5 at 22, 51; Doc. 41-6 at 5; Doc. 41-7 at 3; Doc. 41-8 at 21; Doc. 41-9 at 10, 36, 38, 60; Doc. 41-10 at 2-3, 36-38; Doc. 41-11 at 31.)

37.    RN Whitehead had generic medical encounters while monitoring Mr. Royal in the LCDC medical unit on December 22, 2010, October 3, 2011, October 21, 2011, November 12, 2011, and November 18, 2011.  (Doc. 41-2 at 39-40; Doc. 41-7 at 14-15; Doc. 41-8 at 38-39; Doc. 41-10 at 14-15; Doc. 41-11 at 4-5.)

38.    RN Whitehead entered nursing progress notes related to Mr. Royal on December 23, 2010, July 13, 2011, and January 17, 2012.  (Doc. 41-2; Doc. 41-4 at 52; Doc. 41-11 at 30.)

39.    RN Whitehead responded to Mr. Royal's Medical Request Forms on February 3, 2011, February 9, 2011, February 23, 2011, March 16, 2011, March 18, 2011, May 24, 2011, and November 3, 2011.  (Doc. 41-3 at 44, 47; Doc. 41-4 at 2, 4, 9, 19; Doc. 41-9 at 26.)

40.     RN Whitehead screened Mr. Royal according to various nursing protocols on March 16, 2011, May 24, 2011, November 3, 2011, and January 17, 2012.  (Doc. 41-4 at 5-6, 20; Doc. 41-9 at 33-34; Doc. 41-11 at 25.)

41.     Apart from Mr. Royal's co-payments, LCDC covered the costs of specialist care and lab work that Mr. Royal's providers ordered.  (Doc. 41-5 at 3, 50.)

### 2.     <u>Analysis</u>

A jail or prison medical professional's deliberate indifference to an inmate's serious medical needs violates the United States Constitution.  *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (citing *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)); *Estate of Booker v. Gomez*, 745 F.3d 405, 429 (10th Cir. 2014); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009); *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999).  To hold a private medical contractor acting under color of state law liable for the acts of its employees pursuant to 42 U.S.C. § 1983, a plaintiff must prove both that the employees deprived the inmate of a constitutional right, and that a custom or policy of the private medical contractor was the moving force behind the constitutional deprivation.  *Myers v. Okla. Cnty. Bd. of County Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998) (*citing Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978)); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 81 (2001) (Scalia, J., concurring) ("Under 42 U.S.C. § 1983, a state prisoner may sue a private prison for deprivation of constitutional rights.").  The causal link may be established by showing that the policy or custom "disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights."  *Berry v. City of Muskogee, Okla.*, 900 F.2d 1489, 1496 (10th Cir. 1990); *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).

21

Mr. Royal has sued RN Whitehead in her individual capacity, and Nor-Lea as the contract medical provider at LCDC, alleging that they provided him with constitutionally inadequate medical care while he was housed there.  RN Whitehead cannot be held liable unless the evidence demonstrates that she was deliberately indifferent to Mr. Royal's serious medical needs.  *Sealock*, 218 F.3d at 1209.  Nor-Lea cannot be held liable unless the evidence establishes that one or more of its employees violated his constitutional rights *and* that a Nor-Lea policy or custom was the moving force behind the constitutional violation.  *Myers*, 151 F.3d at 1316.

### a. Defendants are entitled to summary judgment on Mr. Royal's constitutional claims.

In the context of the Eighth and Fourteenth Amendments,[13] "[d]eliberate indifference [to serious medical needs] involves both an objective and a subjective component."  *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (*quoting Sealock*, 218 F.3d at 1209) (internal quotation marks omitted)). The objective component is met if the alleged deprivation of medical care is "'sufficiently serious' to constitute a deprivation of constitutional dimension."  *Self v. Crum,* 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Sealock*, 218 F.3d at 1209.  A delay in medical care is sufficiently serious only where the plaintiff can show that the delay resulted in substantial harm.  *Id.* at 1210 (citing *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993)); *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).

---

[13] Constitutional claims of deliberate indifference to serious medical needs are analyzed under the Eight Amendment for post-conviction inmates and the Fourteenth Amendment's due process clause for pre-trial detainees.  While it is not clear from the record whether Mr. Royal was a pre-trial detainee, a post-conviction inmate, or some combination of the two during his time at LCDC, the Court need not resolve this ambiguity, because the deliberate indifference analysis is the same under either constitutional amendment.  *Estate of Booker,* 745 F.3d at 429; *Martinez,* 563 F.3d at 1088.

To establish the subjective component, in turn, the plaintiff must show evidence of the prison medical provider's culpable state of mind. *Mata*, 427 F.3d at 751 (citing *Estelle*, 429 U.S. at 106). Deliberate indifference is analogous to "criminal recklessness, which makes a person liable when [he] consciously disregards a substantial risk of serious harm." *Id.* at 752; *Self*, 439 F.3d at 1231. Thus,

> [t]he subjective component is satisfied if the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [he] must also draw the inference.

*Mata*, 427 F.3d at 751; *Self*, 439 F.3d at 1231; *see Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) ("To prevail on the subjective component, the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded the risk, by failing to take reasonable measures to abate it."). "[W]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Self,* 439 F.3d at 1231 (quoting *Farmer*, 511 U.S. at 842).

Tenth Circuit cases "recognize two types of conduct constituting deliberate indifference." *Sealock*, 218 F.3d at 1211. One of these "type[s] of deliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Id.* A prison medical professional who serves "solely . . . as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if she "delays or refuses to fulfill that gatekeeper role." *Id.*; *see also Estelle*, 429 U.S. at 104-105 (deliberate indifference is manifested by prison personnel "in intentionally denying or delaying access to medical care").

The other type of deliberate indifference occurs when "a medical professional . . . fail[s] to treat a serious medical condition properly." *Sealock*, 218 F.3d at 1211. However, "[t]he subjective prong is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment." *Self*, 439 F.3d at 1232. Moreover, "a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." *Id.* at 1231; *Perkins*, 165 F.3d at 811; *see Hood v. Prisoner Health Servs., Inc.*, 180 F. App'x 21, 25 (10th Cir. 2006) ("disagreements with the treatment provided by prison medical staff" do not constitute deliberate indifference); *Barron v. Pohlman*, 122 F. App'x 416, 419 (10th Cir. 2005) ("a prisoner's difference of opinion with prison medical personnel regarding the type of treatment he should receive" does not constitute deliberate indifference). A prisoner does not have a constitutional "right to a particular course of treatment." *Callahan*, 471 F.3d at 1160; *see also Ledoux*, 961 F.2d at 1537 (plaintiff's claims that he needed additional medication and specialist's treatment were "insufficient to establish a constitutional violation").

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. *Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.*

*Estelle*, 429 U.S. at 105-06 (emphasis added) (internal quotation marks omitted); *Duffield v. Jackson*, 545 F.3d 1234, 1238 (10th Cir. 2008); *Callahan*, 471 F.3d at 1159; *Self*, 439 F.3d at 1230.

In the present matter, for Mr. Royal to meet the objective element of the deliberate indifference test, he must produce evidence that his alleged medical need was "sufficiently serious" and that any delays in meeting that need caused him "substantial harm." *Oxendine v. Kaplan*, 241 F.3d 1272, 1276-77 (10th Cir. 2001). To meet the subjective element, in turn, Mr.

Royal must produce evidence supporting an inference that RN Whitehead (as to the claim against her) and/or other Nor-Lea employees (as to the claim against Nor-Lea) knew of and disregarded a "substantial risk of harm" to his health or safety. *Id.* at 1277.  Defendants challenge only the subjective component of Mr. Royal's deliberate indifference claim, so the Court assumes for purposes of resolving the parties' summary judgment motions that the objective component has been established.  (Doc. 34 at 6.)

In their summary judgment motion and *Martinez* Report, Defendants have shown that there is no evidence to satisfy the subjective prong of the deliberate indifference standard as to RN Whitehead or any other Nor-Lea employee.  Mr. Royal, in contrast, has neither met his burden of proof as to *his* summary judgment motion, nor produced any specific evidence demonstrating a genuine issue of material fact in response to *Defendants'* summary judgment motion, with respect to the subjective prong.  The record contains no evidence tending to show that RN Whitehead or any other Nor-Lea employee knew of and disregarded an excessive risk to Mr. Royal's health or safety.  Rather, the undisputed evidence shows that the care RN Whitehead and other Nor-Lea employees provided was constitutionally adequate as a matter of law.

More specifically, the undisputed record evidence shows that, before being referred to an eye specialist, Mr. Royal submitted five non-emergency medical request forms related to his eyes,[14] and that LCDC medical providers responded to these requests.  (PF Nos. 2, 4-7.)  In response to his initial eye complaint on November 23, 2010, FNP Tabor examined Mr. Royal, diagnosed him with right eye conjunctivitis, and prescribed a seven-day course of Tobradex ophthalmic drops.  (PF No. 2.)  When Mr. Royal returned for follow-up on December 3, 2010, he

---

[14] Mr. Royal submitted about sixty-three medical request forms during his time at LCDC.  (Doc. 41-1 to 41-11.)  Five of these related to eye pain before, and ten to eye pain after, his uveitis/iridocyclitis diagnosis.  The remaining requests were for a variety of unrelated medical complaints and/or communications with medical staff.  (*Id.*)

had no eye complaints.  (*Id.*)  Mr. Royal did not submit a second medical request form regarding eye pain until three months later, and when RN Whitehead requested more information about this request, Mr. Royal waited several days to respond and then refused to be seen.  (PF No. 4.)

On March 26, 2011, Mr. Royal submitted a third medical request form regarding his eye, stating "my eye hurts and I don't know what's wrong wit[h] it."  (PF No. 5.)  RN Gomez performed a "pink eye" protocol exam, noted his symptoms, and scheduled a provider visit.  (*Id.*) FNP Tabor examined Mr. Royal on March 29, 2011, diagnosed him with allergic conjunctivitis, and prescribed a ten-day course of Maxitrol ophthalmic drops.  (*Id.*)  Similarly, when Mr. Royal submitted a fourth medical request form related to his eyes on April 22, 2011, RN R. Gaitan performed a "pink eye" protocol exam, noted his symptoms, and scheduled a provider visit. (PF No. 6.)  FNP Tabor examined Mr. Royal on April 26, 2011, assessed "probable allergies," and prescribed a ten-day course of Prednisolone ophthalmic drops.  (*Id*.)

Mr. Royal submitted his fifth medical request form relating to eye pain on May 22, 2011. (PF No. 7.)  RN Whitehead performed a "pink eye" protocol exam, noted the chronic nature of Mr. Royal's eye complaints, and scheduled a provider visit.  (*Id.*)  FNP Tabor examined Mr. Royal on May 27, 2011, also documented the chronic nature of Mr. Royal's eye problems, assessed right eye scleritis, and scheduled Mr. Royal to be seen by Optometrist Clay Reber, an outside medical specialist.  (*Id.*)  Dr. Reber saw Mr. Royal on June 7, 2011. (PF No. 8.)  Thus, the undisputed record evidence demonstrates that through May 2011, Mr. Royal presented five non-emergent requests for medical complaints regarding eye pain, received medical treatment in response to each of those requests, experienced temporary improvement with treatment, and had *not* been diagnosed with a serious eye condition for which treatment had been prescribed but withheld.

Once Mr. Royal was diagnosed with uveitis/iridocyclitis, the undisputed record evidence shows that Nor-Lea employees including RN Whitehead provided timely medical treatment for his eye condition as his specialists ordered during his time at LCDC.  (PF Nos. 8-27, 34-40.) From the time Dr. Reber diagnosed Mr. Royal with uveitis on June 7, 2011, and Dr. Marsh diagnosed him with iridocyclitis on August 11, 2011, to the time of his release from LCDC on November 8, 2012, Mr. Royal saw outside eye specialists on at least ten different occasions.  (PF Nos. 8, 10, 14-15, 17-18, 20-21, 23, 28.)  During that time, Nor-Lea employees including RN Whitehead provided prescription medications, arranged for follow-up appointments, and completed lab work and radiologic studies as Mr. Royal's specialists ordered.  (PF Nos. 8-27, 34-40.)  There is some evidence that RN Cervantes informed Mr. Royal that some lab work had been delayed to ensure that duplicate costs were not incurred unnecessarily.  (Doc. 41-5 at 11, 13, 18, 26-27, 29-39, 49.)  However, the lab work in question was completed within days of this communication, and well before Mr. Royal was scheduled to see the provider who had ordered it.[15]  (*Id.*)  Additionally, LCDC housed Mr. Royal in the medical unit for fifty-nine days, where nursing staff monitored his eye condition and administered his medications multiple times per day.  (PF No. 16.)  Thus, the undisputed record evidence shows that once Mr. Royal was diagnosed with uveitis/iridocyclitis, LCDC medical providers, including RN Whitehead, did not disregard his serious medical needs, but rather provided extensive care that complied with his specialists' directives.

---

[15] There is a series of written communications between Mr. Royal and RN Cervantes in which Mr. Royal and RN Cervantes engage in personal attacks on one another.  (*See, e.g.,* Doc. 41-4 at 50, 51; Doc. 41-5 at 24; Doc. 41-6 at 2, 8; Doc. 41-7 at 16, 17; Doc.  41-11 at 40-41.)  While the undersigned does not condone Mr. Royal's often disrespectful manner of communicating with medical personnel, far more troubling are the demeaning and wholly inappropriate personal attacks that RN Cervantes, as a medical professional, Nor-Lea's medical services director, and LCDC's medical grievance officer, directed at Mr. Royal.  RN Cervantes' flagrantly unprofessional conduct in this regard strongly suggests that he may be unsuited to work with inmate populations and reflects poorly on Nor-Lea as his employer.  However, it does not, without more, rise to the level of a constitutional violation.

Mr. Royal's allegations that RN Whitehead relied on her own judgment regarding the seriousness of his medical needs, and failed to respond to his ongoing complaints of eye pain, are also unsupported. The undisputed material facts indicate that, during Mr. Royal's time at LCDC, RN Whitehead did not prescribe or formulate treatment for Mr. Royal, but rather served as a gatekeeper for medical professionals capable of doing so, and provided the medical treatment they prescribed, in accordance with her nursing responsibilities. (PF Nos. 33-40.) To that end, the record evidence demonstrates that RN Whitehead reviewed provider notes and physician orders, responded to medical request forms, had generic medical encounters while monitoring Mr. Royal in the LCDC medical unit, screened Mr. Royal according to various nursing protocols, and referred and scheduled Mr. Royal for provider care. (*Id.*)

Specifically, the undisputed record evidence shows that, before Mr. Royal's diagnosis of uveitis/iridocyclitis, RN Whitehead responded to two of Mr. Royal's five medical request forms related to eye pain. (PF Nos. 4, 7.) In the first instance, RN Whitehead requested additional information, to which Mr. Royal failed to respond; in the second, she performed a "pink eye protocol" exam and referred Mr. Royal for provider care. (*Id.*) After his diagnosis of uveitis/iridocyclitis, RN Whitehead's involvement in Mr. Royal's medical care related to his eye condition included speaking with Dr. Reber regarding Mr. Royal's eye drops, monitoring Mr. Royal while he was housed in the LCDC medical unit, noting the medications Dr. Reber prescribed for Mr. Royal, and performing a Medical Intake Screening when Mr. Royal returned to LCDC from CNMCF. (PF Nos. 12, 16, 24, 36-40.) Thus, the undisputed material facts show that, while Mr. Royal was housed at LCDC, RN Whitehead provided Mr. Royal with appropriate nursing care and did not, in her gatekeeper role, deny or delay Mr. Royal's access to medical providers.

To the extent Mr. Royal contends that Defendants were negligent in diagnosing and treating his eye problems, that is not enough to state a valid claim of deliberate indifference under the Eighth or Fourteenth Amendment. "[I]nadvertent failure to provide adequate medical care" does not establish a constitutional violation, nor does a complaint that a "physician has been negligent in diagnosing or treating a medical condition." *Self*, 439 F.3d at 1230 (quoting *Estelle*, 429 U.S. at 105-06). Additionally, to the extent Mr. Royal disagrees with Nor-Lea employees' medical judgment in assessing and treating his eye condition, his disagreement is also insufficient to state a valid claim of unconstitutional medical mistreatment. *Id.* at 1231. As previously discussed, the undisputed facts indicate that, before Mr. Royal's diagnosis of uveitis/iridocyclitis, RN Whitehead and other Nor-Lea employees consistently provided medical care for Mr. Royal's eye condition, albeit based on a diagnosis of recurrent allergic conjunctivitis.[16] The undisputed facts further support that, after his diagnosis, RN Whitehead and other Nor-Lea employees provided extensive medical care for Mr. Royal's eye condition as his specialists directed. In short, the undisputed evidence shows that Defendants did not act with deliberate indifference to Mr. Royal's medical needs as a matter of law, and Mr. Royal has failed to present any evidence to the contrary.

To the extent Mr. Royal argues that requiring him to make co-payments for medical care violated his Fourteenth and/or Eighth Amendment rights, he is mistaken. The requirement that

---

[16] Mr. Royal has failed to present any competent evidence that this diagnosis, while possibly incorrect, was negligent to the "extraordinary degree" necessary to demonstrate a constitutional violation. *Self*, 439 F.3d at 1232. Rather, the record evidence suggests that the diagnosis was consistent with Mr. Royal's symptoms and response to treatment at the time. (PF Nos. 2, 5, 6.) In addition, Mr. Royal has failed to present any evidence to support a finding that Defendants' acts or failure to act caused or contributed to the permanent partial loss of vision in his right eye. There is nothing in the record to suggest that either Dr. Reber or Dr. Marsh believed that any treatment Mr. Royal received, or any delay in such treatment, caused or worsened his eye condition. On the contrary, both doctors ordered laboratory tests to try to determine the cause of Mr. Royal's frequent cases of iritis, albeit unsuccessfully. (PF Nos. 14, 18.) In addition, Dr. Marsh determined that a cataract likely contributed to the loss of visual acuity in Mr. Royal's right eye. (PF No. 15.) Finally, even with specialized care, Mr. Royal's eye condition persisted; both Dr. Reber and Dr. Marsh described it as chronic, and the same condition presented in both eyes. (PF Nos. 13, 15-17, 19, 20.)

an inmate with adequate resources contribute a co-payment for his healthcare does not constitute deliberate indifference.[17]   *Tijerina v. Patterson*, 507 F. App'x 807, 810 (10th Cir. 2013) (citing *Reynolds v. Wagner*, 128 F.3d 166, 174 (3d Cir. 1997)); *see also Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 408 (9th Cir. 1985) (charging inmate $3.00 for each medical visit was not *per se* unconstitutional, and, standing alone, did not constitute deliberate indifference). Mr. Royal has not produced any evidence from which a reasonable factfinder could conclude that he might have received more, different, or better care but for the co-payment requirement, much less that this requirement was a "moving force" behind the alleged violation of his constitutional rights.   *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985).   In short, there is insufficient evidence from which a jury could conclude that Nor-Lea or any of its policy-makers consciously disregarded a substantial risk of serious harm to Mr. Royal by instituting or acceding to a co-payment requirement at LCDC.

In all of the above respects, Defendants have shown an absence of evidence to support a verdict in Mr. Royal's favor that RN Whitehead or any other Nor-Lea employee acted with deliberate indifference to his serious medical needs; and, Mr. Royal has failed to identify any specific facts to the contrary in response to Defendants' summary judgment motion.   Mr. Royal has likewise failed to meet his burden of proof as a cross movant for summary judgment on his deliberate indifference claims.   The uncontroverted record demonstrates that Mr. Royal received extensive care from Nor-Lea medical personnel and outside specialists, and that Defendants were not indifferent to his medical needs.   Defendants are therefore entitled to judgment as a matter of

---

[17] Mr. Royal received notice of, and had access to information regarding, his responsibility to make co-payments. (Doc. 41-1 at 35-36; Doc. 41-4 at 54; Doc. 41-11 at 45-46; Doc. 49-4 at 13-14; Doc. 49-5.)  Mr. Royal also had a right to examine his co-pay bills, receive an explanation of charges, and express any complaints regarding the same through LCDC's grievance process, which he used for other purposes.   (*Id.*; Doc. 41-2 at 8, 14, 31; Doc. 49-4 at 19.)

law as to Mr. Royal's deliberate indifference claims under the Eighth and Fourteenth Amendments.

Because there are no genuine disputes of material fact from which a reasonable jury could find a violation of Mr. Royal's constitutional rights, the Court need not address Mr. Royal's allegations that Nor-Lea had a custom, policy, and practice of withholding and/or delaying medical care as a cost-saving measure based on inmates' inability to pay. *Myers*, 151 F.3d at 1316. In any event, the record evidence indicates that no such custom, policy, or practice existed, and that Defendants did not withhold or delay medical treatment based on Mr. Royal's inability to pay. (PF Nos. 29-32.) Accordingly, the undersigned recommends that the Court GRANT Defendants' Motion for Summary Judgment, and DENY Mr. Royal's Motion for Summary Judgment, as to Mr. Royal's federal constitutional claims against Defendants.

### b.   The Court should decline to exercise supplemental jurisdiction over Mr. Royal's remaining state law claims.

To the extent that Mr. Royal's complaint may be construed as raising state law medical malpractice claims against Defendants, the undersigned recommends that the Court decline to exercise supplemental jurisdiction over such claims. Under 28 U.S.C. § 1367, the Court may decline to exercise supplemental jurisdiction over state law claims once "all claims over which it ha[d] original jurisdiction" have been dismissed. 28 U.S.C. § 1367(c)(3). "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011). "[N]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Young v. City of Albuquerque*, 77 F. Supp. 3d 1154, 1185 (D.N.M. 2014). Whether to exercise supplemental jurisdiction in such circumstances is a matter entrusted solely to this

Court's discretion.  *Estate of Harshman v. Jackson Hole Mountain Resort Corp*., 379 F.3d 1161, 1165 (10th Cir. 2004); *Koch*, 660 F.3d at 1248.  Thus, and as a matter of comity, to promote justice, and to allow New Mexico's state courts to decide any remaining questions of state law, the undersigned recommends that the Court in its discretion decline to exercise supplemental jurisdiction over any extant state law claims Mr. Royal has attempted to bring in this case.  The undersigned further recommends that the parties' summary judgment motions be denied as moot as to those claims.

**B.**     **Mr. Royal's Motion to Amend**

Federal Rule of Civil Procedure 15(a) allows a party to amend an initial pleading once as of right within a limited period of time.  Fed. R. Civ. P. 15(a)(1).  "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "The grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court."  *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006).  The Court may properly deny leave to amend when it finds "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment."  *Id.* (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

In the Tenth Circuit, untimeliness can be a sufficient reason to deny leave to amend a complaint, particularly when the movant provides no adequate explanation for the delay.  *Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1315 (10th Cir. 2005); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1495 (10th Cir. 1995); *Pallottino v. City of Rio Rancho*, 31 F.3d 1023, 1027 (10th Cir. 1994) ("Where the party seeking amendment

knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial.") (internal quotations and citation omitted)); *see also Federal Ins. Co. v. Gates Learjet Corp.*, 823 F.2d 383, 387 (10th Cir. 1987) ("If … delay in amending results in prejudice to the opposing party, denial of the motion is justified.").   In the present matter, the Court recommends that Mr. Royal's Amended Civil Rights Complaint (Doc. 44), which the Court liberally construes as a motion for leave to file a second amended complaint, be denied for the following reasons.

### 1.      Mr. Royal's motion to amend is untimely.

Mr. Royal's case had been pending for close to two years when he filed the motion to amend presently before the Court.   Further, the Court long ago afforded Mr. Royal the opportunity to cure any deficiencies in his original complaint, and Mr. Royal took advantage of that opportunity by filing a first Amended Complaint.   Yet, Mr. Royal has failed to provide any explanation for his delay in seeking leave to file a second amended complaint at this late juncture.   The factual basis of the claims Mr. Royal now seeks to add, and the factual basis of the claims in his first two complaints, are the same.   As such, Mr. Royal could have asserted his proposed new claims in August 2013 or January 2014, but chose not to do so.   For these reasons, the Court concludes that Mr. Royal's motion to amend is untimely and recommends that it be denied.  *Pallottino*, 31 F.3d at 1027.

### 2.      Permitting Mr. Royal to reassert previously dismissed claims would be futile.

In his proposed second amended complaint, Mr. Royal seeks to reassert claims against former Defendants that the Court has previously dismissed.   (Doc. 44 at 2-3, 5-6, 9-20.) Specifically, the Court previously dismissed, and Mr. Royal now seeks to reassert, constitutional claims for deliberate indifference to serious medical needs against former Defendants Cervantes,

Gartman, Downey, Tabor, and Lea County Commissioners.  (*Id.*; Doc. 22 at 2-3.)  Mr. Royal has not provided the Court with any reason to revisit the dismissal of these claims.  The Court therefore concludes that it would be futile to permit Mr. Royal to amend his complaint to reassert them, and recommends that Mr. Royal's motion to amend be denied on this basis as well.

### 3.  <u>Mr. Royal's attempt to assert new claims against RN Whitehead and previously dismissed parties is futile, untimely, and unfairly prejudicial.</u>

In his proposed second amended complaint, Mr. Royal also seeks to assert new First and Fourteenth Amendment claims against RN Whitehead and former Defendants Cervantes, Gartman, Downey, Tabor, and Lea County Commissioners, and to add an Eighth Amendment claim that RN Whitehead was deliberately indifferent to his medical needs in relation to a skin rash.  (Doc. 44 at 2-3, 5-20.)  The Court recommends denying leave to add these claims for three reasons.  First, permitting Mr. Royal to add these claims would be futile.  Mr. Royal offers only vague and conclusory allegations to support his proposed new claims, which would not survive a review pursuant to 28 U.S.C. § 1915A or a motion to dismiss pursuant to Federal Rule of Civil Procedure 12.  *See Robbins v. Oklahoma*, 519 F.3d 1242, 1249-50 (10th Cir. 2008) (in cases under 42 U.S.C. § 1983, it is particularly important that the complaint allege who did what to whom).  Second, as discussed above, Mr. Royal has entirely failed to explain why he delayed so long in seeking to add these claims.  Finally, allowing Mr. Royal to add these claims at this late juncture would be unduly prejudicial to the proposed Defendants, who would be required engage in discovery and motions practice to defend against entirely new claims well over two years into this lawsuit, having already devoted substantial resources to resolving Mr. Royal's claims.  For these reasons, the Court recommends that Mr. Royal's motion to amend to assert new claims against RN Whitehead and previously dismissed parties be denied.

4.     **Mr. Royal's attempt to add new parties is untimely, futile, and unfairly prejudicial.**

Finally, Mr. Royal seeks to add two new parties in his proposed second amended complaint, *i.e.*, LCDC and Marsha Hart, R.N.   (Doc. 44 at 3-4, 6-7.)   As noted above, Mr. Royal's request is untimely, and he has failed to explain why he delayed so long in seeking to add these new parties.   Further, allowing Mr. Royal to assert claims against RN Hart and LCDC would be futile.   The last encounter Mr. Royal had with RN Hart was on February 19, 2011, (Doc. 41-3 at 50-54), but Mr. Royal did not file his motion to amend to assert claims against her until May 13, 2015.   A Section 1983 claim arising in New Mexico is subject to a three-year statute of limitations. *Wilson v. Garcia*, 471 U.S. 261, 280 (1985); *Mondragon v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008); *Jackson v. Bloomfield*, 731 F.2d 652, 654 (10th Cir. 1984).   Thus, Mr. Royal's proposed claims against RN Hart would be barred by the three-year statute of limitations, which expired on or about February 19, 2014.[18]   As to LCDC, in turn, Mr. Royal alleges only that it "created policies or customs under which unconstitutional practices occurred or allowed the continuance of such policy or custom."   (Doc. 44 at 3.) Mr. Royal's proposed claims against LCDC are therefore excessively vague and conclusory and would not survive judicial review pursuant to 28 U.S.C. § 1915A or Rule 12.   *Robbins*, 519 F.3d at 1249-50.

Lastly, permitting Mr. Royal to file a second amended complaint to add new parties would be unduly prejudicial to both Defendants and the parties he seeks to add.   This case is two

---

[18] Mr. Royal has also not demonstrated that his claims against RN Hart should relate back to an earlier complaint. Pursuant to Rule 15, an amendment to change the party against whom a claim is asserted will not relate back to the filing of an earlier complaint unless, within the time allowed for serving the complaint, the new party "(i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C)(i), (ii).   "Rule 15(c), which exists to protect defendants from unfair prejudice caused by a plaintiff's tardiness in naming them, applies to *pro se* complaints as to any others."   *Pierce v. Amaranto*, 276 F. App'x 788, 792 (10th Cir. 2008).

and a half years old.  Information and evidence regarding Mr. Royal's current claims have long since been exchanged.  Dispositive motions have been filed and briefed, and are ripe for resolution.  Permitting Mr. Royal's proposed amendments at this stage of the litigation would indefinitely delay the imminent resolution of this case to the current Defendants' detriment, and require the new Defendants to defend against Mr. Royal's claims without prior knowledge of all that has occurred to date.  Thus, the Court recommends that Mr. Royal's motion to amend to add new parties be denied because of undue delay, and because adding the new parties would be futile and unduly prejudicial.

**C.**      **Defendants' Motion to Strike and Mr. Royal's Motion to Vacate**

In light of the foregoing recommendation that the Court deny Mr. Royal's motion for leave to file a second amended complaint, the undersigned further recommends that the Court deny as moot Defendants' Motion to Strike Plaintiff's Amended Complaint and/or Motion to Amend Complaint (Doc. 45), and Mr. Royal's Motion to Vacate Civil Rights Complaint Against Nurse Hart (Doc. 55).

### III. Recommendations

For the reasons stated above, the Court recommends as follows:

1.      That Defendants' Motion for Summary Judgment (Doc. 33) be **GRANTED** as to Mr. Royal's federal claims, that his remaining state law claims be **DISMISSED WITHOUT PREJDUICE**, and that Defendants' Motion for Summary Judgment as to the state law claims be **DENIED AS MOOT**;

2.      That Mr. Royal's Motion for Summary Judgment (Doc. 50) be **DENIED**;

3.      That Mr. Royal's motion for leave to file a second amended complaint, in the form of his Amended Civil Rights Complaint (Doc. 44) be **DENIED**;

4.      That Defendants' Motion to Strike Plaintiff's Amended Complaint and/or Motion to Amend Complaint (Doc. 45) be **DENIED AS MOOT**; and,

5.      That Mr. Royal's Motion to Vacate Civil Rights Complaint Against Nurse Hart (Doc. 55) be **DENIED AS MOOT**.

Timely objections may be made pursuant to 28 U.S.C. § 636(b)(1)(c).  Within fourteen (14) days after a party is served with a copy of these proposed findings and recommendations that party may file written objections to such proposed findings and recommendations with the Clerk of the United States District Court for the District of New Mexico.  A party must file any objections within the fourteen (14) day period allowed if that party wants to have appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE